UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

ANGELA DIZER                          *      CIVIL ACTION NO. 3:10CV699

VERSUS                                *      JUDGE ROBERT G. JAMES

DOLGENCORP, INC., ET AL.              *      MAG. JUDGE KAREN L. HAYES

REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a

Motion for Summary Judgment filed by defendant Dolgencorp, Inc. ("Dollar General"), (Doc. #

25).  Also pending is a Motion to Strike and Objections to Evidence (Doc. # 35) filed by

defendant Dollar General.  Dollar General argues that there is no genuine issue of material fact

that the plaintiff, Angela Dizer, qualified for the executive exemption to the overtime

requirement imposed by the Fair Labor Standards Act ("FLSA").  It also requests that the Court

strike certain exhibits presented by Dizer in opposition to its Motion for Summary Judgment.

Both motions are opposed.  For reasons to follow, it is **RECOMMENDED** that the defendant's

Motion for Summary Judgment be **GRANTED**.  In addition, it is **ORDERED** that the

defendant's Motion to Strike and Objections to Evidence be **SUSTAINED in part and**

**OVERRULED in part**.

BACKGROUND

I.      **Procedural History**

The present litigation originated in the United States District Court for the Northern

District of Alabama in 2006 as a class action.  *See* Doc. # 2.  The various plaintiffs brought this

action to remedy alleged violations of the wage provisions of the Fair Labor Standards Act

("FLSA"), seeking unpaid overtime compensation for work weeks requiring sixty to ninety hours from store managers paid on a salary basis when only a fraction of those hours were spent on managerial duties.  *Id.*  They allege that the store managers are also entitled to liquidated damages, prejudgment interest, and attorney's fees.  *Id.* at p. 4.   At the close of the collective plaintiffs' case-in-chief, the Alabama court decertified the class.  This case, along with twenty-seven others, was transferred to the United States District Court for the Western District of Louisiana on March 30, 2010.  Doc. # 7.  The cases were stayed on August 10, 2010, to allow the parties in the related cases to conduct discovery that would be common to all.  Dollar General then filed this Motion for Summary Judgment on September 22, 2011, asserting that it is entitled to judgment as a matter of law on the grounds that Dizer was exempt from overtime compensation under the executive exemption of the FLSA.  Doc. # 25.  Following this filing, the stay was lifted to allow the court to rule on the pending motion.  This motion, along with the defendant's Motion to Strike evidence presented by Plaintiff in opposition to the defendant's Motion for Summary Judgment, were referred to the undersigned on October 31, 2011, and are now ripe for consideration.

## II.    Undisputed Material Facts[1]

Dollar General is a retailer of basic consumable goods, items that are frequently used and replenished by consumers, including cleaning supplies, health and beauty aids, foods and snacks, housewares, toys and basic apparel.  Most of these goods are priced below ten

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docs. # 25-1, 32-1, and 32-2) and related exhibits.  Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Griffin v. United Parcel Service, Inc.*, 661 F.3d 216, 221 (5th Cir. 2011).

2

dollars, with approximately 25% of merchandise priced at or below one dollar.  As of February

2010, Dollar General operated 8,877 Dollar General stores in thirty-five states, making it the

largest discount retailer in the United States by number of stores.

      Each Dollar General store is run pursuant to a manual containing Dollar General's

Standard Operating Procedures ("SOP's").  These stores are staffed with one Store Manager, the

only salaried employee, and, ordinarily, an Assistant Store Manager ("ASM"), a Lead Clerk, and

multiple store clerks.  When Dizer was employed as a Store Manager for Dollar General, stores

had an average of seven to eight employees, of which four to five were clerks.  Store Managers

report to a District Manager ("DM"); DM's supervise fifteen stores on average, and as many as

twenty-five stores.  DM's visit each store within their district at least once every four to six

weeks, but typically do not have keys to stores in their districts.

      Dollar General typically relies on each Store Manager to implement and enforce the

Company's policies and procedures in her store.  The Store Manager receives store mail

regarding various issues, and it is the Store Manager's responsibility to implement those

directives in her store.  Store Managers are paid weekly, on a salary basis, and are paid at least

the statutory rate required under the FLSA for the executive exemption.  Store Managers are also

eligible for certain annual bonuses; these bonuses are tied to the financial and operational

performance of the Store Manager's own store and individual performance, rather than the

Company's overall profits.  During Dizer's tenure as a Store Manager, the highest bonus an ASM

could receive was 30% of the Store Manager's bonus eligibility.

      Dizer was hired as an hourly store clerk at Dollar General in 1997 and was ultimately

promoted to the Store Manager position in March 1999 at Store No. 1728, where she stayed for

four months.  Dizer was then promoted to a larger location (Store No. 4507), and later promoted to another larger location after sixteen months (Store No. 652), until her employment ended in October 2002.  As Store Manager, Dizer was the highest paid employee in her store.  In 2001, Dizer earned a fixed weekly salary of $455 per week, which was increased to $480.77 in 2002. Dizer agrees that she earned "substantially more as a Store Manager" than she did as an hourly employee, and substantially more than any of the hourly employees at her store who worked under her.[2]

With respect to her job functions, Dizer acknowledged in her deposition that she performed all of the duties outlined in the Store Manager job description.  While she claims that she was unable to perform some of these duties because of other manual-labor duties, she conceded at her deposition that she eventually found a way to timely complete the duties in the job description.

As part of her supervisory duties, Dizer trained each employee at her store, used customer complaints as training opportunities, and checked her store three to four times a day to see that tasks were being completed as assigned.  She also recommended pay raises and promotions to her DM (almost all of which were approved), and allocated the store's labor budget by scheduling employees' hours.[3]

---

[2] Dizer argues that, considering that she worked fifty-five to sixty hours per week, she effectively did not "earn substantially more than the assistant store manager."  Doc. # 32-2, ¶ 23. However, this does not alter the fact that she made more money *per week* than the assistant store manager.  *See, e.g.*, *Hartman v. Dolgencorp of Texas, Inc.*, No. 09-009, 2010 U.S. Dist. LEXIS 140314, at *12 (N.D. Tex. June 24, 2010) ("Although Plaintiff attempts to divide her weekly salary by alleged hours worked, courts have disregarded this attempt and focused instead on the weekly amount of pay.").

[3] Dizer apparently disputes the fact that she allocated the store's labor budget.  She claims that the store received individualized voicemails from the district manager that allotted the

In addition, she was responsible for ordering merchandise, marking down damaged goods, and recruiting, hiring and firing employees.  She also prepared performance evaluations of the other employees in her store, and walked the store two to four times a day to look for areas that needed work, watch cashier activity, check on the status of assignments, note whether progress was being made, and give direction and feedback to other employees on their work. Dizer was also responsible for executing progressive counseling discipline related to employee conduct and performance issues.

Dizer analyzed the weekly store reports to look for irregularities, such as a large number of refunds or exchanges by one sales associate, or smaller basket sizes (amount of each sales transaction).  She also managed her store's use of supplies to control expenses, and in turn, increase profitability.  On a weekly basis, she would analyze what was selling, and tried to order product to match her forecast to maximize sales.  Dizer testified that she personally contributed to an increase in the sales and profitability of Stores No. 1728 and 652.

Dizer also performed non-managerial tasks in her role as Store Manager.  In fact, she estimated that she spent 90% of her time performing manual-labor duties.  Specifically, she testified to cashiering, stocking, cleaning, unloading trucks, and taking out the trash.  Dizer agreed, however, that when she was performing non-managerial tasks, she would continue to monitor and manage the operation of the store.  No matter what she was doing, she would always be supervising and training employees, and would always be seeking to maximize the sales and profitability of her store.

---

store's labor budget.  Doc. # 32-2, ¶ 88.  However, this does not contradict a finding that she allocated the budget provided to her by the district manager.

During the first month after Dizer began as a Store Manager, her DM Charles Lynn Duke would visit for thirty to sixty minutes per week, and then about once per month thereafter.  DM David Wilson also visited about once per month when Dizer was at Store No. 4507 and once every two months after she transferred to Store No. 652.  Dizer's temporary DM, Darlene Dutchman, came to the store for an hour or less every day for one month at the Winnsboro store (No. 652) to help deal with big issues of shrink, break-ins, and employee turnover.  She would also check the store's paperwork and ensure that everything was where it was supposed to be. Dizer's stores received district-wide voice messages daily from the DM's, but these messages concerned non-individualized matters like district business and upcoming sales.  The stores would also receive a weekly individualized voice message providing the sales or payroll budgets for the following week.  Otherwise, Dizer's only required communications with her DM were to report her stores' sales, payroll and labor hours used, as well as in certain special circumstances, such as when Dizer's stores struggled or she needed the guidance of a supervisor.

## III.    Motion to Strike and Objections to Evidence[4]

Defendant filed a Motion to Strike and Objections to Evidence regarding eighteen exhibits attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment.  These exhibits include: 1) a 2004 Dollar General Survey pertaining to the operation of its stores; 2) Dollar General monthly newsletters; 3) a Dollar General performance evaluation; 4) a Dollar General business memorandum; and 5) a portion of Dollar General's Standard Operating

---

[4] Although Rule 12(f) of the Federal Rules of Civil Procedure allows a court to strike evidence only from *pleadings*, and not motions or briefs, the undersigned will consider Dollar General's objections to the Plaintiff's evidence.  *See* Fed. R. Evid. 103(a)(1)(A) (2011) (requiring a timely and specific objection or motion to strike any evidence a party contends should not be considered by the court).

Procedures Manual.  The undersigned will consider each piece of evidence in turn.

### A.    2004 Dollar General Survey

Defendant asks the Court to strike Plaintiff's Exhibits 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13 and 14 from a 2004 Dollar General Survey.  This survey was related to the process by which Dollar General stores were converted to "EZ Stores"—a conversion that resulted in increased efficiencies for each store in the process of unloading a truck shipment and getting the product to the sales floor.  As part of this initiative, Dollar General conducted surveys of store-level employees in Texas and Oklahoma to measure how much time was spent within their stores on various tasks.  Defendant argues that this survey was unrelated to Plaintiff's store or any other store in Louisiana, and that it was not limited to the position of Store Manager.  Rather, defendant argues the survey results reflect how much time a store, as a whole, spent on particular tasks.

Plaintiff responds, and the undersigned agrees, that it is not unusual for a company the size of Dollar General to rely on a limited sampling for a survey of this kind.  Dollar General is a business that depends largely on predictability and uniformity, and surveys in Louisiana would have been unnecessary to analyze the business's overall store conditions.  As for Dollar General's arguments that the results are irrelevant because they do not specifically apply to Store Managers, the undersigned can review the information and determine what, if any, weight to give to it.  Defendant's objections to Exhibits 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13 and 14 are overruled.

### B.    Dollar General Monthly Newsletters

Defendant next moves to strike Plaintiff's Exhibits 16, 17, and 26, monthly newsletters published by Dollar General.  These three newsletters were published in October 2004, August

2004, and January 2003, respectively.  Defendant argues that the newsletters are irrelevant as they contain no evidence of what Dizer did individually as a Store Manager for Dollar General.  Plaintiff, however, responds that the relevance of the newsletters lies in their discussion of the importance of the standard operating procedures manual, as well as the importance of the District Manager.  The undersigned agrees that the newsletters are relevant.  They need not specifically reference Dizer, nor be issued during her tenure to be relevant.  As pointed out by Dizer, the importance of the district manager likely did not change from 2002 to 2004.  Thus, the newsletters were close enough in time to her tenure with Dollar General to meet the minimal standards for relevance, and defendant's objections to Exhibits 16, 17, and 26 are overruled.

### C.    Dollar General Performance Evaluation

Defendant also moves to strike Plaintiff's Exhibit 18, the January 2001 evaluation of store manager Kimberly Baker.  Defendant argues that it lacks the proper foundation, contains inadmissible hearsay, is irrelevant and is likely to cause confusion and unfair prejudice.  Plaintiff responds that Dollar General used the exact same form to evaluate Store Managers as it did to evaluate Assistant Store Managers, as is established by the header of the document.

The undersigned finds this evidence to be relevant, as it is probative of whether the duties of a Store Manager were truly distinctive compared to the Assistant Store Managers.  The evaluation was prepared in January 2001, during Dizer's tenure at Dollar General.  The undersigned also finds the evidence admissible under the business records exception to the hearsay rule.  This exception allows records to be admitted if "kept in the course of a regularly conducted [business] activity . . . [and if] making the record was a regular practice of that activity."  Fed. R. Evid. 803(6).  Here, the performance evaluation is a standard form prepared in

8

the regular practice of Dollar General's course of business.  Thus, this exhibit is admissible and

defendant's objection to Exhibit 18 is overruled.

### D.    Dollar General Business Memorandum

Defendant next requests the court strike Plaintiff's Exhibit 9, a business memorandum

dated April 2004 that discusses truck delivery procedures in place at that time.  Defendant argues

that this memorandum is not relevant, since it was prepared eighteen months after Dizer's

employment at Dollar General had ended.  Plaintiff responds that the memorandum is relevant

because it goes to show that a significant portion of the labor budget at Dollar General stores

must be spent on "truck day."

The undersigned agrees that it is unlikely that this system changed in the eighteen months

between the end of Dizer's employment and the date of the memorandum.  Defendant has made

no effort to show this is the case.  Thus, the undersigned finds this evidence relevant to Plaintiff's

argument that Dollar General's low-price business model renders it unable to pass labor costs to

consumers, forcing Store Managers to perform non-managerial duties.  Defendant's objection to

Exhibit 9 is overruled.

### E.    Selection from the Standard Operating Procedures Manual

Finally, defendant moves to strike Plaintiff's Exhibit 25, a selection from Dollar

General's Store Operating Procedures Manual.  Defendant argues that the selection is dated

October 2005, a full three years after Dizer's employment at Dollar General ended.  Plaintiff

responds that the selection is being offered to show the extent to which her discretion was limited

by corporate headquarters through the manual.

In contrast to the newsletters and the business memorandum, which were offered to

illustrate generally how the defendant's business is run, Plaintiff is offering the selection from the

Store Operating Procedures Manual to show that this specific document limited her discretion.

However, she admits that this is not the manual that was in place during her tenure at Dollar

General, and she does not show that the manual in place during her tenure was substantially

similar to the manual offered.  Thus, the undersigned finds this evidence to be irrelevant and

inadmissible to show how Dizer's discretion was limited by the manual in effect during her

tenure.  Defendant's objection to Exhibit 25 is sustained.

## IV.    Motion for Summary Judgment

### A.      Standard for Summary Judgment

Summary judgment is appropriate when the evidence before the court shows "that there is

no genuine issue as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A fact is "material" if its resolution could affect the outcome of the

action.  *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).

A dispute about a material fact is "genuine" only if a reasonable jury could return a verdict for

the non-moving party.  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of "informing the district court of the basis for

its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)).  "The

moving party may meet its burden to demonstrate the absence of a genuine issue of material fact

by pointing out that the record contains no support for the non-moving party's claim."  *Stahl v.*

*Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate.  *Id.*

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the nonmovant.  *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).  The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; must disregard all evidence favorable to the moving party that the jury is not required to believe; and must give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached.  *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).  However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."  *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts."  *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Amer. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

**B.**   **Analysis**

**1. The FLSA Overtime Compensation Requirement**

The Fair Labor Standards Act ("FLSA") requires employers to pay overtime to employees who work more than forty hours per week.  *See* 29 U.S.C. § 207(2).  However, the FLSA

exempts from its overtime requirements those employees who work in a  "bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).

The executive exemption is further delineated by regulations issued by the Department of Labor ("DOL").  29 C.F.R. § 541 (2003).  These regulations were amended by the DOL on August 23, 2004;[5] prior to the amendments, the regulations provided both a "short test" and a "long test" to be used in determining an employee's status.  *See* 29 C.F.R. § 541.1 (2003).  The "long test" requires the employer to show that the employee is one

> (a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and

> (b) Who customarily and regularly directs the work of two or more other employees therein; and

> (c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

> (d) Who customarily and regularly exercises discretionary powers; and

> (e) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section: Provided, that this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20–percent interest in the enterprise in which he is employed; and

> (f) Who is compensated for his services on a salary basis at a rate of not less than $155 per week . . . .

---

[5] Because Dizer's employment with Dollar General ended before August 23, 2004, her claims are evaluated under the prior test.  Thus, Dizer's argument that the executive exemption "doesn't apply to blue-collar workers" is grounded in the 2006 version of Section 541, and will not be considered here.  *See* Doc. # 32, p. 2 (citing 29 C.F.R. § 541.3(a) (2006)).

*Id.*

This test is limited in subsection (f), which provides for a "short test" if the employee "is compensated on a salary basis at a rate of not less than $250 per week."  *Id.* § 541.1(f).  In such a circumstance, an employee need only satisfy subsections (a) and (b) of Section 541.  *Id.*  In this case, then, Dollar General would need to prove: 1) that Dizer was compensated on a salary basis of not less than $250 per week; 2) that Dizer was primarily responsible for the management of a customarily recognized department or subdivision thereof; and 3) that Dizer customarily and regularly directed the work of two or more other employees.  The parties do not dispute that Dizer's salary started and remained within the statutory qualifications for the pre-2004 "short test."  Furthermore, neither party contests that Dizer "customarily and regularly direct[ed] the work of two or more other employees."  *Id.* § 541.1(b).  Therefore, the only factor at issue is whether Dizer's "primary duty" was management.

### a. Plaintiff's Primary Duty

The defendant argues that Dizer's employment satisfies the "primary duty" test based on the relevant factors, and, therefore, no question of material fact exists.  Whether an employee's primary duty consists of management is a fact-sensitive inquiry, but "[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent of the employee's time."  29 C.F.R. § 541.103.29 C.F.R. § 541.103 (2003).  However, time alone is not the sole test, and " in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion."  These other pertinent factors include: 1) the relative importance of managerial duties; 2) frequency of discretionary powers; 3) relative

freedom from supervision; and 4) the relationship between exempt employees' salary and non-exempt employees' wages. *Vela v. City of Houston*, 276 F.3d 659, 677 (5th Cir. 2001) (citing *Quirk v. Baltimore County*, 895 F. Supp. 773, 786 (D. Md. 1995)).  Thus, the undersigned will first consider what percentage of time Dizer spent performing managerial duties, and then move to the other factors to determine whether a genuine issue of material fact exists concerning Dizer's primary duty at Dollar General.

### i. Time Spent on Managerial Activities

The question of how employees spend their working time is a question of fact.  *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).  However, "[t]he question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law . . . ."  *Id.*  Here, the defendant does not dispute how Dizer spent her working time; thus, the facts are not in dispute, just the ultimate legal conclusions to be drawn.

Under pre–2004 DOL regulations, "management" duties include, but are not limited to, the following:

> Interviewing, selecting and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the [employees] and the property.

The Fifth Circuit has held that "an employee's 'primary duty' cannot be ascertained by applying a simple 'clock' standard that contrasts the amount of time each day an employee spends on exempt and nonexempt work."  *KDFW v. Dalhiem*, 918 F.2d 1220, 1227 (5th Cir.

1990).  Thus, while the general rule is that employees who spend more than fifty percent of their time performing exempt work will generally satisfy the primary duty requirement, this rule is not dispositive.  *See id.*; *see also Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 504 (6th Cir. 2007) ("[T]he time factor is less momentous, and might even be somewhat misleading, where the employee's management and non-management functions are [not] . . . clearly severable.") (internal quotation marks omitted) (ellipse and second bracket in original) (quoting *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982)); *see also Haines v. Southern Retailers, Inc.*, 939 F. Supp. 441, 449 (E.D. Va. 1996) ("[A] number of federal courts have disregarded the time factor . . . where the manager is in charge of a separate facility such as a convenience store or restaurant chain location.") (internal quotation marks omitted) (quoting *Meyer v. Worsley Co., Inc.*, 881 F. Supp. 1014, 1020 (E.D.N.C. 1994)).  Numerous courts, including some within the Fifth Circuit, have found retail store managers exempt despite claims that they spent the majority of their time on non-managerial tasks.  *See In re Family Dollar FLSA Litig.*, 637 F.3d 508, 515 (4th Cir. 2011) (store manager exempt despite testimony that she spent 99% of time on non-managerial duties); *Murray v. Stuckey's, Inc.*, 939 F.2d 614, 618-20 (8th Cir. 1991) (Stuckey's manager met the "primary duty" test even though 65 to 90% of the manager's time was spent on nonmanagerial duties); *Grace v. Family Dollar Stores, Inc.*, 3:08-md-1932, 2011 U.S. Dist. LEXIS 89769, at *18 (W.D.N.C. Aug. 11, 2011) (granting summary judgment against store manager claiming to have spent 90 to 95% of time unloading trucks, stocking shelves, cashiering and cleaning); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 866–67 (N.D. Tex. 2001) (store manager exempt despite testimony that he spent up to ninety percent of his time performing the same work as hourly employees and did not have final decision-making

15

authority).

It is undisputed that, as store manager, it was Dizer's responsibility to recruit and select qualified employees;[6] ensure that her store was properly staffed;[7] provide proper training and conduct performance evaluations for employees at her store;[8] identify gaps for appropriate solutions and counseling employees;[9] communicate performance, conduct and safety expectations;[10] evaluate operating statements to identify business trends; including sales, profitability and inventory turn;[11] order merchandise each week to ensure in-stock targets were met or exceeded;[12] ensure that merchandise was properly presented, priced, and signed according to company standards;[13] maintain accurate inventory levels by controlling damages and markdowns;[14] ensure financial integrity of the store with strict cashier accountability and security of keys to the store;[15] provide customer service leadership;[16] ensure that the store was well-

---

[6] Dizer Dep. 49:13-18.

[7] Dizer Dep. 49:19-21.

[8] Dizer Dep. 49:22-25.

[9] Dizer Dep. 50:1-6.

[10] Dizer Dep. 50:7-51:24.

[11] Dizer Dep. 51:25-52:9.

[12] Dizer Dep. 52:10-25.

[13] Dizer Dep. 53:14-20.

[14] Dizer Dep. 53:21-24.

[15] Dizer Dep. 53:25-54:4.

[16] Dizer Dep. 53:25-54:4.

equipped with all necessary tools and was maintained in a clean, well-organized fashion;[17] review and implement directives from the corporate offices, such as product recalls;[18] and ensure the timely completion of all paperwork and documentation according to company guidelines.[19]

Nevertheless, Dizer claims that she spent ninety percent of her time performing nonmanagerial, "manual-labor" duties such as cashiering, stocking, cleaning, unloading trucks, and taking out the trash.  Deposition of Angela Dizer, Doc. # 25-5 ("Dizer Dep."), 257:11–18. Dollar General disputes this estimate by pointing to excerpts from Dizer's deposition testimony in which she details how much time she spent on particular activities.  Adding these numbers up, the defendant shows that Dizer spent up to twenty-seven hours per week, or 45 to 60% of her time, on management tasks.[20]

Defendants further argue that even 100% could be a proper measure, since Dizer "was at all times managing and 'in charge' of ensuring the running of the store."  Doc. # 25-2, p. 3. FLSA regulations recognize "concurrent duties" and do not require that managerial and non-managerial duties be artificially segregated in order for the exemption to apply, particularly in a retail environment like a Dollar General store.  *See* 29 C.F.R. § 541.106 (2011); *see also* 29 C.F.R. § 541.103 (2003) (when an employee engaged in nonmanagerial work simultaneously

---

[17] Dizer Dep. 54:8-16; 201:10-21.

[18] Dizer Dep. 54:21-55:5.

[19] Dizer Dep. 55:6-11.

[20] Doc. # 25-1, ¶¶ 90-94.  Dizer, in turn, discredits the defendant's estimate of the time spent on managerial tasks, claiming that the defendant improperly included up to three hours that should not have included.  Doc. # 32-2, ¶ 90.  The undersigned notes that this may be due to discrepancies or contradictions in the deposition testimony and, in any case, would hardly affect the ultimate calculation.

supervises other employees, "[h]e will be considered to have management as his primary duty");[21] *Johnson v. Home Team Productions, Inc.*, No. Civ.A. 03-2775, 2004 WL 1586552, at *6, n.5 (E.D. La. July 15, 2004) ("[O]ne can still be 'managing' if one is in charge, even while physically doing something else.") (quoting *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982)); *Roberts v. National Autotech, Inc.*, 192 F. Supp.2d 672, 678-79 (N.D. Tex. 2002) (granting summary judgment where manager of auto service center spent majority of his time on non-managerial tasks like cleaning the bathroom, since "[his] primary importance . . . was as manager of his store").

Here, Dizer admits that during the time that she describes as "90% non-managerial," she was nonetheless always managing her store, her employees, the business operations, and her customers, along with trying to increase sales and decrease losses.  Dizer Dep. 267:3-268:10. For example, she specifically testified that while she was unloading the shipment truck, she was also directing the store clerks and other employees who were also unloading the truck.  While Dizer was stocking the shelves, she was also monitoring the registers, supervising her employees, guarding against shoplifting, and observing and taking care of customers.  Dizer Dep. 264:12-268:10.

Thus, even if the court accepts the fact that Dizer spent the majority of her time

---

[21] Unlike the current version, the pre-2004 regulations did not expressly address the concept of concurrent duties; nevertheless, several courts interpreting the earlier version have acknowledged that an employee could have management as her primary duty even if she concurrently performed nonexempt duties.  *See, e.g., Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 504-05 (6th Cir. 2007); *Jones v. Virginia Oil Co.*, 69 Fed. App'x 633, 637-38 (4th Cir. 2003); *Murray v. Stuckey's, Inc.*, 939 F.2d 614, 617-20 (8th Cir. 1991); *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982); *Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir. 1982).

performing non-managerial tasks such as stocking the shelves, unloading the shipment truck, cleaning the store, and operating the cash register, the record also reflects that she could simultaneously perform many of her management tasks.  Indeed, it can not be rationally assumed that the store went without management 90% of the time.  *See In re Family Dollar FLSA Litigation*, 637 F.3d 508, 515 (4th Cir. 2011) ("While [plaintiff] catalogs the nonmanagerial jobs that she had to do, claiming that they occupied most of her time, she does so without recognizing that during 100% of the time, even while doing those jobs, she was also the person responsible for running the store.").  Accordingly, the time spent performing managerial duties is not determinative here, and the undersigned must consider the other factors in the "primary duty" test.  *See Horne v. Crown Cent. Petroleum, Inc.*, 775 F. Supp. 189, 190 (D.S.C. 1991) (holding the amount of time spent on non-managerial tasks is not dispositive of the issue, "particularly when non-management duties are performed simultaneous to the supervision of employees or other management tasks and other factors support a finding that the employee's primary duty is managerial").

### ii. Relative Importance of Managerial and Non–Managerial Duties

The next element of the primary duty inquiry evaluates the relative importance of Dizer's managerial and non-managerial duties from the perspective of the employer, Dollar General.  *See, e.g., Dalheim v. KDFW–TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) ("the employee's primary duty will usually be what she does that is of principal value to the employer"); *Haines v. S. Retailers, Inc.*, 939 F. Supp. 441, 449 (E.D. Va.1996) (treating relative importance "as a measure of the significance of the managerial tasks to the success of the facility").  One way courts address this factor is to ask how the store would function if the employee failed to perform her

19

non-managerial or managerial duties, alternatively.  *See Mayne-Harrison v. Dolgencorp, Inc.*,
No. 1:09-CV-42, 2010 U.S. Dist. LEXIS 98096, at *39 (N.D.W.V. Sept. 17, 2010) (considering
"whether the business in question could have operated as successfully without the managerial
tasks carried out by the 'exempt' employee"); *Donovan*, 675 F.2d at 521 (noting that the
restaurant could not have operated successfully had the assistant managers not determined the
amount of food to be prepared, ran cash checks, scheduled and supervised employees, and
checked inventory).

    In the instant case, Dizer testified at her deposition that if she had not performed some of
her non-managerial duties, the store would still be able to function.  Dizer Dep. 274:20-275:4.
Further, she admitted that without hiring, training, scheduling employees, ensuring the store
opened and closed, her store could not have run at all.  Dizer Dep. 275:5-9.  Finally, Dizer
testified that to further the running of a profitable business, her managerial duties were more
important than her non-managerial duties.  Dizer Dep. 275:16-19.  When confronted with the
same issue and presented with similar facts, other courts have granted summary judgment in
favor of the employer.  *See*, *e.g.*, *Horne*, 775 F. Supp. at 191 ("The clerks merely rowed the boat;
[the store manager] charted and steered its course."); *King v. Dolgencorp, Inc.*, No. 09–00146,
2010 U.S. Dist. LEXIS 140302, at *35 (M.D. Pa. May 6, 2010) (finding that "[i]f [the] plaintiff
did not perform her nonmanagerial duties, her Dollar General store may not have functioned
well; but if she did not perform her managerial duties, the store would have been incapable of
doing business.").

    Moreover, the Sixth Circuit has found that where managerial duties include hiring
employees, training employees "on rudimentary procedures such as operating the register," and

20

"assigning the weekly work schedule," those duties are "much more important" to a store's success than are the non-managerial duties of "stocking merchandise, sweeping floors, and cleaning bathrooms." *Thomas*, 506 F.3d at 505.  It is undisputed that Dizer's managerial duties included regular and frequent hiring, firing, training and scheduling — among numerous other managerial responsibilities.  No one else at the Dollar General store could perform these duties; hence, the store could not effectively operate without Dizer functioning as the Store Manager.  Her management duties were absolutely critical to day-to-day store operations.  Accordingly, the undersigned finds that the relative importance of Dizer's management responsibilities exceeded those of her non-management activities.

### iii. Exercise of  Discretionary Powers

Next, the undersigned must evaluate the frequency with which Dizer exercised discretionary powers.  The exercise of discretionary powers involves the comparison and the evaluation of possible courses of conduct and making a decision after the various possibilities have been considered.  *See* 29 C.F.R. § 541.107(a) (2003).  Furthermore, it implies the employee has authority to make an independent choice, free from direction or supervision.  *See id.*  In other words, "[a] person whose work is so completely routinized that he has no discretion does not qualify for exemption."  *Id.*  Nevertheless, the exercise of discretionary powers does not mean that the decisions made by the employee must have a finality associated with unlimited authority and a complete absence of review.  *See Murray v. Stuckey's, Inc.*, 939 F.2d 614, 619 (8th Cir. 1991) ("[T]he manager of a local store in a modern multi-store organization has management as his or her primary duty even though the discretion usually associated with management may be limited by the company's desire for standardization and uniformity.").

Here, Dizer argues that she had very little ability to exercise discretion.  For example, she notes that Dollar General dictates exactly where merchandise is placed in a store, and how many items should go on each shelf, through the use of "planograms."  Doc. # 32, p. 14.  She also points to Dollar General's Standard Operating Procedures ("SOP's") to show her inability to exercise discretion.  *Id.* at p. 15.  The SOP's provide very detailed instructions regarding the day-to-day operations of the store.  They provide guidance on how to handle even the smallest of details, such as how to answer the telephone while also running the cash register; what items should be hung on a clipboard in the store's office; and what steps should be taken to ensure that the floor is clean.  *Id.*  Dizer claims that "[t]he mere existence of this manual could lead a reasonable jury to conclude that Dollar General closely supervised Dizer and limited her discretion."  *Id.*

However, Dizer's deposition testimony refutes her argument that these manuals limited her ability to exercise discretion.  Dizer testified that despite the existence of the planograms, there was still a portion of the store that was "manager's choice" and "flex space."  Dizer Dep. 185:21-22, 186:24-187:2.  Dizer would use her discretion to place certain items in these areas in order to maximize the sales and profitability of the store.  Dizer Dep. 187:6-16.  Furthermore, Dizer admitted that the SOP's did not impact her management on a daily basis.  Dizer Dep. 44:9-45:25, 46:8-19.  Indeed, she could not recall any specific times when she reviewed the SOP's, and may have only looked something up once every three months at her first store, and never after that.  *Id.*  Dizer also testified that she relied on her own managerial instincts in order to make her daily decisions.  Dizer Dep. 224:6-25.  Thus, the record shows that Dizer's ability to exercise discretion was not rigidly circumscribed by the planograms or SOP's.  *See Hartman*,

22

2010 U.S. Dist. LEXIS 140314 at *16-17 ("that certain [Dollar General] standard operating procedures are to be followed in a formulaic way does not imply a lack of discretion").

The record further shows the extent to which Dizer regularly exercised discretion.  For example, she used her discretion to interview and hire at least nineteen employees,[22] fire thirteen employees,[23] and make several promotion decisions.[24]  Dizer also had authority to request merit pay increases for employees, and all but one of those requests was approved.  Dizer Dep. 335:16-336:13.  She also had discretion to manage her store's schedule and labor budget.   In doing so, she assigned staff to specific projects and allocated the store's limited labor as she best saw fit.  Dizer Dep. 154:2-7, 179:14-19.

Furthermore, Dizer exercised discretion in her management of the store's inventory.  She had "very much" discretion in ordering, and used her discretion to obtain the best mix and proper quantities of merchandise for her store in order to increase sales.  Dizer Dep. 250:9-21, 327:6-19.  At her own discretion, Dizer would mark down damaged goods[25] and transfer or exchange merchandise with other Dollar General stores.[26]

In support of her position, Dizer points to the fact that some of her actions required the approval of the DM or corporate headquarters, such as promoting or transferring an employee, conducting a performance evaluation, taking a vacation, and closing the store due to a power

---

[22] Dizer Dep. 135:17-136:5, 140:3-13, 140:19-141:5.

[23] Dizer Dep. 138:2-138:12, 138:17-139:17, 141:15:24.

[24] Dizer Dep. 107:7-18, 109:11-24, 134:9-135:3.

[25] Dizer Dep. 251:1-14.

[26] Dizer Dep. 338:4-16.

outage or bad weather.  Doc. # 32, pp. 18-20.  The essential thrust of this argument is that

because her superiors had the final authority to make some important decisions, management was

not her primary duty.  The undersigned disagrees.  Exempt retail managers are not expected or

required to have unfettered discretion as to all possible decisions.  *Thomas*, 506 F.3d at 507

(finding that although the plaintiff's "discretion was by no means unfettered and abounding," she

exercised managerial discretion "on a sufficiently frequent basis to support a finding that

management was her primary duty").  And although an employee's decision may be subject to

review and, on occasion, revised or reversed after review, this does not necessarily mean that the

employee is not exercising discretion.  *See Murray v. Stuckey's, Inc.*, 939 F.2d 614, 619 (8th Cir.

1991).

Here, it is clear that Dizer regularly exercised discretion in several important areas, such

as interviewing, hiring and training of employees; recommending promotions and pay raises;

conducting performance evaluations; scheduling employees' hours; placing merchandise in

certain areas to maximize sales and profitability; and managing the store's inventory.  As such,

the undersigned concludes that Dizer was vested with sufficient discretionary powers under this

factor of the "primary duty" test.

### iv. Relative Freedom from Supervision

The next factor concerns the employee's "relative freedom from direct supervision."  29

C.F.R. § 103 (2003); *Thomas*, 506 F.3d at 507.  Dizer claims that her DM[27] frequently monitored

her, and that the DM "supervised and managed the store through regular communications."  Doc.

---

[27] Dizer had three DMs while employed by Dollar General.  *See* doc. # 25-1, ¶¶ 104-06. Because Dizer has not indicated that her experience varied from one DM to another, and for ease of reading, this discussion often speaks in terms of one, generic district manager.

# 32, p. 14.  However, the record does not reflect that upper management heavily supervised Dizer's work.

Except for a one-month period when she started as a Store Manager and another one month period at a troubled store, Dizer's DM did not visit more than once every month or two months.  *See* SOF at ¶104-108.  And while physical presence may not be a prerequisite to supervision,[28] the record shows the DM remotely monitored Dizer scarcely more often.  The DM would leave daily, generalized voicemails with all the stores in his district; the DM also left weekly, individualized voicemails providing Dizer with the payroll budget.  Dizer Dep. 156:25-157:22.  Other than these voice messages, the only times Dizer would receive supervision would be in certain special circumstances, such as when Dizer's stores struggled or she needed the guidance of a supervisor.  Dizer Dep. 157:23-159:22.

Notwithstanding these communications, Dizer remained free of direct supervision for most of her time on the job.  Dizer was the most senior employee at her station; no other on-site employee was her equal.  Thus, on a day-to-day basis, she generally operated without a supervisor looking over her shoulder or monitoring her every move.  Occasional visits and remote communications do not alter the inescapable fact that she was the person in charge of her store.  *See Thomas v. Speedway SuperAmerica*, 506 F.3d 496, 507 (6th Cir. 2007) (noting that despite the constant availability of the district manager to the store managers, the fact that the district manager was in the store once or twice a week, and was frequently in touch via phone

---

[28] *See Kanatzer v. Dolgencorp, Inc.*, No. 4:09CV74, 2010 U.S. Dist. LEXIS 67798, at *16 (E.D. Mo. July 8, 2010) (finding that the record did not "resolve the question of how frequently the district manager remotely monitors [the store manager's] activities or what the monitoring entails") ; *Jones v. Dolgencorp, Inc.*, No. C 10–3020, 2011 U.S. Dist. LEXIS 61597, at *51 (N.D. Iowa June 8, 2011) (quoting *Kanatzer* for the same proposition).

and email, that plaintiff was relatively free from supervision); *Cavins v. Dolgencorp, Inc.*, No. 1:10-CV-0261, 2011 WL 6848385, at *18 (S.D. Ohio Dec. 29, 2011) (although Dollar General store manager's DM monitored her with monthly visits and at least five voicemails per day, "she was still free from direct supervision for the majority of the time while working at her store").

In sum, while it is true that Dizer received some supervision from her DM, she operated free from supervision the vast majority of her time at Dollar General.  *See Thomas*, 506 F.3d at 507 ("[This factor] considers only the " relative freedom from supervision"; it does not demand complete freedom from supervision, such that she is answerable to no one, as this would disqualify all but the chief executive officer from satisfying this factor of the primary duty inquiry.").  Dizer also agrees that her DM's did not interfere in any way with her ability to perform her duties as a Store Manager.  Dizer Dep. 56:22-25.  Accordingly, the undersigned finds that Dizer was relatively free from supervision.

### v. Relationship Between Salary and Other Employee Wages

The final factor in determining an employee's primary duty concerns "the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor." 29 C.F.R. § 541.103 (2003).  Courts have deemed a manager's salary to be "significantly more" than subordinates' wages in cases involving disparities of 30 to 42% between the two amounts.  *See, e.g.*, *Thomas*, 506 F.3d at 509; *Kastor*, 131 F. Supp. 2d at 868; *Hartman*, 2010 U.S. Dist. LEXIS 140314 at *17-18.

During her tenure as Store Manager Dizer was paid significantly more than the hourly employees, including the Assistant Store Manager ("ASM").  Most hourly employees at Dizer's store started out earning close to minimum wage, or $5.15 per hour at that time.  Dizer Dep.

314:15-19.  The next highest-paid employee at the store, the ASM, earned $6.85 to $7.06 per

hour.  Dizer Dep. 62:23-63:3.  This indicates that the most money per forty-hour work week[29]

any of the other employees could make is $282.40.  Dizer, on the other hand, earned from $455

to $480.77 per week during the relevant time period,[30] or at least 38% more than the next highest

paid employee.

      Dizer argues that her earnings should be divided by the number of hours she worked.  She

contends that under this calculation, she effectively did not "earn substantially more than the

assistant store manager."  Doc. # 32-2, ¶ 23.  However, Dizer's method directly conflicts with the

language of the appropriate regulation, which concerns "the relationship between [her] *salary*

and the *wages paid* other employees for the kind of nonexempt work performed by the

supervisor." 29 C.F.R. § 541.103 (2003).  This element "does not confine its inquiry to, or

otherwise mention, overtime earnings or wages[.]" *Thomas*, 506 F.3d at 509.  Indeed, several

courts have rejected this method of calculation, and have instead looked at the amount earned by

each employee per week.  *See, e.g.*, *Hartman*, 2010 U.S. Dist. LEXIS 140314 at *12; *Johnson v.*

*DG Retail LLC*, No. 08-123, 2010 U.S. Dist. LEXIS 47416, at *18-19 (D. Utah May 13, 2010);

*Kastor*, 131 F. Supp. 2d at 868-69.   Apparently in the alternative, she also compares her weekly

earnings with a hypothetical ASM who worked sixty hours per week.  However, she presents no

evidence that any ASM worked sixty hours, and Dizer testified that ASM's generally worked

--------

[29] Dizer testified that the ASM's generally worked forty hours or fewer per week.  Dizer
Dep. 147:9-18.

[30] In Dizer's comparison of salaries and wages, she uses her starting Store Manager salary
of $325 per week in 1999.  However, Dizer first filed her FLSA claim on April 7, 2004.  *See* Ex.
2, Dizer Dep. 6:25-7:7.  Thus, her pre-2001 workweeks fall outside of the FLSA's maximum
statute of limitations, and are irrelevant to any comparison under this element.  *See* 29 U.S.C.A. §
255(a).

forty hours or fewer per week.

In addition, Dizer was eligible to earn bonuses of up to $10,000, and these bonuses were tied directly to her store's performance and profitability.  Dizer Dep. 57:12-59:21.  She testified that she governed the store with these criteria in mind, and she attempted to maximize the performance of her store in order to receive a bonus.  Finally, the record shows that during Dizer's tenure as a Store Manager, the highest bonus an ASM could receive was 30% of the Store Manager's bonus eligibility,[31] and she could not recall any of her subordinates ever receiving a bonus.[32]

In sum, the undisputed facts demonstrate a significant disparity between Dizer's salary and the wages of her employees.  In fact, Dizer even testified at her deposition that she earned "substantially more" than every other employee in her store.  Dizer Dep. 41:3-5.  Therefore, the undersigned finds that Dizer earned substantially more than her non-exempt subordinates.

## CONCLUSION

After a careful analysis of the primary duty factors, the undisputed evidence establishes that no genuine issue of material fact exists concerning Dizer's primary duty at Dollar General.  No reasonable jury could find Dizer's primary duty was anything other than management.  She was thus properly classified as "exempt" and was not entitled to overtime benefits.  Accordingly, the undersigned **RECOMMENDS** that the defendant's Motion for Summary Judgment (Doc. # 25) be **GRANTED**.  In addition, it is **ORDERED** that the defendant's Motion to Strike and

---

[31] *See* Declaration of Jeff Rice, Doc. # 26-20, ¶ 5; *see also* Teamshare Bonus Plans (1999-2006), Doc. # 26-19.

[32] Dizer Dep. 59:22-60:12.

Objections to Evidence (Doc. # 35) is **SUSTAINED in part and OVERRULED in part** as set out above.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

**THUS DONE AND SIGNED** this 12th day of January, 2012, in Monroe, Louisiana.


KAREN L. HAYES
U. S. MAGISTRATE JUDGE